PEOPLE v SMART

Docket No. 314980. Submitted August 6, 2013, at Detroit. Decided
    February 11, 2014, at 9:05 a.m. Leave to appeal sought.
    Defendant was charged in the Genesee Circuit Court with one count
        of felony murder, two counts of armed robbery, one count of assault
        with intent to murder, and one count of carrying a firearm during
        the commission of a felony in connection with the robbery and
        death of Megan Kreuzer. Defendant supplied a gun to two other
        men who planned the robbery. Defendant also witnessed the
        robbery, during which one of the other men shot and killed
        Kreuzer. Defendant's involvement in Kreuzer's death was un-
        known until he was charged with an unrelated carjacking and
        advised his attorney in the carjacking case, Patricia Lazzio, that he
        had information concerning a homicide and hoped to work out a
        plea bargain. Lazzio spoke with an assistant prosecuting attorney;
        arranged for defendant to meet with the officer in charge of the
        homicide case, Mitch Brown; and elicited an agreement from the
        prosecutor that the information supplied by defendant would not
        be used against him. At the meeting, defendant admitted supply-
        ing the gun to the individuals who planned the robbery of Kreuzer
        and to witnessing the shooting. Defendant subsequently entered
        into a written plea agreement in the carjacking case, which in part
        required defendant to testify in proceedings related to Kreuzer's
        death. Before entering the plea in court, however, defendant began
        to have second thoughts about whether he had gotten the best
        possible deal and requested another meeting with Brown. Lazzio
        advised defendant that the deal would not improve and asked
        Brown to tell defendant the same thing. Brown sought guidance
        from the prosecutor, who advised Brown to meet with defendant to
        see if he could obtain more information about the homicide. On
        June 8, 2011, a second meeting was held between Brown, defen-
        dant, and Lazzio. Brown advised defendant that it was the
        prosecutor's office that decided what deals to offer and that he did
        not think the plea offer would get any better. Defendant continued
        to converse with Brown, revealing additional information about
        the robbery and homicide and further implicating himself in the
        homicide. The following day, defendant pleaded guilty in the
        carjacking case. On June 30, 2011, defendant failed to comply with

the terms of his plea agreement, refusing to testify at the preliminary examination of one of the men charged with Kreuzer's death. Defendant was thereafter charged in this case. Defendant moved under MRE 410 to suppress the statements he had made at the two meetings with Brown. The prosecution conceded that defendant's first statement to Brown was inadmissible, but argued that the second statement to Brown should be admitted. The court, Richard B. Yuille, J., suppressed both statements. The prosecution appealed by leave granted.

The Court of Appeals *held*:

Under MRE 410(4), any statement made in the course of plea discussions with an attorney for the prosecuting authority that does not result in a plea of guilty or that results in a plea of guilty that is later withdrawn, is not admissible against the defendant who made the plea or was a participant in the plea discussions. Under a prior version of the rule addressed in *People v Dunn*, 446 Mich 409 (1994), the Supreme Court held that the rule applied when the defendant had an actual subjective expectation to negotiate a plea at the time of the discussion and that expectation was reasonable given the totality of the objective circumstances. The amendment of MRE 410 added a required element that the statement subject to exclusion must have been made in the course of plea discussions with an attorney for the prosecuting authority. In this case, the prosecution failed to adequately brief the question whether there was an attorney for the prosecuting authority present at the June 8, 2011 meeting and whether that fact would have any bearing on the admissibility of the challenged statement under the rule. Accordingly, the issue was abandoned. The prosecution also foreclosed review of the issue because, by admitting that defendant's first statement was given in the course of plea discussions with the prosecuting authority even though no prosecutor was present when defendant made that statement, it had conceded that for purposes of MRE 410, a prosecuting attorney need not be physically present to hear the statements made. Further, the precise meaning and application of the phrase "with an attorney for the prosecuting authority" cannot be decided without proper briefing by the parties, which did not occur in this case. Instead, in reliance on *Dunn*, the prosecution argued that defendant did not have a reasonable expectation that he would be negotiating a plea on June 8, 2011. The trial court did not clearly err by holding to the contrary. In holding the meeting with the knowledge that defendant requested and would appear at the meeting in an attempt to negotiate a better plea deal, Brown, at the prosecutor's direction, gave defendant a reasonable belief that plea negotiations would take place at the June 8, 2011 meeting. Moreover, the parties actually

made additional minor changes to the plea agreement after the June 8, 2011 meeting. Thus, the totality of the objective circumstances support the trial court's finding that defendant's expectation that plea negotiations were ongoing was reasonable.

Affirmed.

Judge WILDER, dissenting, would have held that defendant's June 8, 2011 statement did not occur in the course of plea negotiations with an attorney for the prosecuting authority. In *People v Hannold*, 217 Mich App 382 (1996), the Court of Appeals held that when the facts establish that no prosecuting attorney was present at the time the defendant made his incriminating statements to the police, MRE 410(4) is simply inapplicable. The evidence adduced at the evidentiary hearing conducted by the trial court in this case, and submitted in the record on appeal, clearly demonstrated that there was no attorney for the prosecuting authority present at the June 8, 2011 meeting. Therefore, under the binding authority of *Hannold*, the trial court erred by finding that defendant made his June 8, 2011 statement in the course of plea negotiations. Because the facts necessary to resolve the unpreserved question of law, namely, the proper interpretation of MRE 410(4), were presented, this Court should have reviewed the question. Despite the holding in *Hannold*, however, under the unambiguous plain language of MRE 410(4), the fact that an attorney for the prosecuting authority is not physically present when the statement is made is not dispositive. In this case, plea negotiations between an attorney for the prosecuting authority and defendant had concluded when defendant made his June 8, 2011 statement as demonstrated by the signing of a written plea agreement before that date, the fact that Brown did not meet with defendant at the prosecution's direction but instead at defense counsel's request, and the fact that it was made clear to defendant before he gave his June 8, 2011 statement that the plea deal would not improve. Thus, defendant did not make the statement during the progress or process of plea negotiations. Further, when defendant gave his statement during the June 8, 2011 meeting, he had no right to be informed of his rights under *Miranda v Arizona*, 384 US 436 (1966), because he was not in custody for purposes of *Miranda*.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *David S. Leyton*, Prosecuting Attorney, and *Vikki Bayeh Haley*, Assistant Prosecuting Attorney, for the people.

*Daniel D. Bremer* for defendant.

Before: SERVITTO, P.J., and CAVANAGH and WILDER, JJ.

SERVITTO, P.J. The prosecution appeals by leave granted[1] the trial court's order suppressing statements made by defendant on March 15, 2011, and June 8, 2011. We affirm the order suppressing both statements.

"This Court reviews de novo the trial court's ultimate ruling on the defendant's motion to suppress." *People v Brown*, 279 Mich App 116, 127; 755 NW2d 664 (2008). If this Court's "inquiry requires interpretation of the Michigan Rules of Evidence, an issue of law is presented, which this Court reviews de novo." *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007). The trial court's findings of fact at a suppression hearing are reviewed for clear error. *People v Chowdhury*, 285 Mich App 509, 514; 775 NW2d 845 (2009).

Defendant was charged with one count of felony murder, MCL 750.316(1)(b); two counts of armed robbery, MCL 750.529; one count of assault with intent to murder, MCL 750.83; and one count of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b, in connection with the robbery and shooting death of Megan Kreuzer on May 31, 2010. Defendant supplied a gun to two other men who planned the robbery. Defendant also witnessed the robbery, during which one of the other men shot and killed Kreuzer.

Defendant's involvement was unknown until he was charged in another incident and advised his attorney in that case, Patricia Lazzio, that he had information concerning a homicide. Hoping to work out a favorable

[1] See *People v Smart*, unpublished order of the Court of Appeals, entered March 27, 2013 (Docket No. 314980).

plea bargain in the pending case against him, Lazzio spoke with Assistant Prosecuting Attorney Richmond Riggs of the Genesee County Prosecutor's Office and thereafter arranged a meeting with Sergeant Mitch Brown, the officer in charge of the homicide case, to discuss the instant matter. Lazzio, believing that defendant may have been a witness to the murder, elicited an agreement from Riggs that the information defendant provided at the meeting would not be used against him. At the March 15, 2011 meeting attended by Sergeant Brown, defendant, and Lazzio, defendant (to Lazzio's surprise) admitted to providing a weapon to the individuals who planned the robbery of Kreuzer and then witnessing the shooting. Thereafter, defendant entered into a written plea agreement in the case pending against him. Defendant subsequently desired to schedule another meeting with Sergeant Brown because defendant questioned whether his attorney had secured the best possible plea agreement. Sergeant Brown and Lazzio both believed the plea agreement would not change, and Lazzio asked Sergeant Brown to tell defendant that the plea agreement would not improve. Nevertheless, the prosecutor's office urged Sergeant Brown to meet with defendant again to see if he could obtain more information from defendant about the homicide.

As a result, a second interview between defendant, Lazzio, and Sergeant Brown took place on June 8, 2011. At that meeting, Sergeant Brown told defendant that he did not think that the plea agreement was going to get any better and that it was the prosecutor's office that decided what plea deals to offer. Defendant and Sergeant Brown still continued to converse and defendant ultimately revealed further information about the robbery and homicide that implicated him more than he had originally admitted. Defendant was thereafter charged in the instant case.

Before trial, defendant orally moved to suppress the statements he had made at both the March 15, 2011 and June 8, 2011 meetings pursuant to MRE 410. The trial court conducted an evidentiary hearing to take testimony from those who had participated in the interviews and, at the conclusion of the hearing, the trial court suppressed both statements.

The prosecution conceded (and still concedes) that defendant's March 15, 2011 statement was inadmissible under MRE 410(4), as a statement made during plea discussions, but argues that MRE 410(4) does not apply to defendant's June 8, 2011 statement. We disagree.

MRE 410 provides:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

> * * *

> (4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Citing *People v Dunn*, 446 Mich 409, 415-416; 521 NW2d 255 (1994), the prosecution first contends that defendant's expectation that the June 8, 2011 meeting would lead to a better plea agreement was unreasonable. In *Dunn*, our Supreme Court held that MRE 410 applies when (1) the defendant has " 'an actual subjective expectation to negotiate a plea at the time of the discussion,' " and (2) that expectation is reasonable " 'given the totality of the objective circumstances.' " *Dunn*, 446 Mich at 415, quoting *United States v Robertson*, 582 F2d 1356, 1366 (CA 5, 1978).

We note that the version of MRE 410 at issue in
*Dunn* read as follows:

> Inadmissibility of Pleas, Offers of Pleas, and Related
> Statements.
>
> Except as otherwise provided in this rule, evidence of a
> plea of guilty, later withdrawn, or a plea of nolo contendere,
> or of an offer to plead guilty or nolo contendere to the crime
> charged or any other crime, or of statements made in
> connection with any of the foregoing pleas or offers, is not
> admissible in any civil or criminal proceeding against the
> person who made the plea or offer. However, evidence of a
> statement made in connection with, and relevant to, a plea
> of guilty, later withdrawn, a plea of nolo contendere, or an
> offer to plead guilty or nolo contendere to the crime
> charged or any other crime, is admissible in a criminal
> proceeding for perjury or false statement. [*Dunn*, 446 Mich
> at 414 n 14 (citation and quotation marks omitted). See
> also *People v Stevens*, 461 Mich 655, 661 n 4; 610 NW2d 881
> (2000).]

Thus, the amendment of MRE 410 added a required
element that the statement subject to exclusion must
have been made in the course of plea discussions with
an attorney for the prosecuting authority. In arguing
that MRE 410 does not apply to the June 8, 2011
statement, the prosecution states that "[s]ince there
was no attorney for the prosecuting authority present
and since defendant had no reasonable basis to expect a
second statement to result in further plea negotiations,
the trial court erroneously applied MRE 410." (Empha-
sis omitted.) However, the prosecution focuses its argu-
ment *exclusively* on whether defendant's subjective
expectation of obtaining further plea negotiations was
reasonable, given Sergeant Brown's and defendant's
own attorney's statements to him that no better plea
agreement would be obtained. The prosecution does not
elaborate on its claim that there was no attorney

present and did not even cite the prior language of MRE 410. "An appellant may not . . . give issues cursory treatment with little or no citation of supporting authority." *Houghton v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003). An appellant may also not merely announce a position and leave it to this Court to rationalize the basis for the claim, or elaborate the argument. *Blackburne & Brown Mtg Co v Ziomek*, 264 Mich App 615, 619; 692 NW2d 388 (2004). "An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *Houghton*, 256 Mich App at 339-340. We thus decline to address whether there was an attorney for the prosecuting attorney "present" during the June 8, 2011 meeting and whether that fact has any bearing on the admissibility of the challenged statement made during that meeting.

We specifically decline to address this issue not only because the prosecution abandoned it, but for additional reasons as well. First, although it has been established that no prosecuting attorney was physically present during the March 15, 2011 meeting between Sergeant Brown and defendant, the prosecution has nevertheless conceded that the March 15, 2011 statements were inadmissible under MRE 410. Clearly, then, the prosecution believes that the statements by defendant at the March 15, 2011 meeting were given "in the course of plea discussions with an attorney for the prosecuting authority" despite the absence of the physical presence of a prosecuting attorney during that meeting. For our purposes, and, we emphasize, *in this particular case*, then, the prosecution has conceded that a prosecuting attorney need not be physically present for statements to be deemed inadmissible under MRE 410. The prosecution has foreclosed review of this specific issue in this case by its concession.

Second, looking at MRE 410(4), the rule does not explicitly state that an attorney for the prosecuting authority must be physically present when the statement is made—and that is what the prosecution's single statement on this issue provides: that an attorney was not physically present. Rather, under MRE 410(4) statements are admissible only when made "in the course of plea discussions with an attorney for the prosecuting authority . . . ." "In the course of" means "in the process of, during the progress of." I *Oxford English Dictionary* (compact ed., 1971), p 1088. It is conceivable that a defendant may speak to persons other than an attorney for the prosecuting authority in the course of plea discussions. Indeed, a defendant may speak to persons, such as police officers, *at the direction* of an attorney for the prosecuting authority in the course of plea discussions, as it could be argued occurred here. Again, however, the precise meaning and application of this phrase (i.e., because pleas and plea offers can be withdrawn, whether plea negotiations are ever deemed concluded; whether a statement made to an agent of an attorney for the prosecuting authority is subject to suppression so long as it is made "in the course of" a defendant's plea negotiations; who may act as an agent for an attorney for the prosecuting authority, etc.) for purposes of suppression under MRE 410, was not addressed by the prosecution. More importantly, this issue is far too significant and multifaceted to be decided without proper briefing by both parties. While this Court *may* review issues not properly raised or addressed by a party "if a miscarriage of justice will result from a failure to pass on them, or if the question is one of law and all the facts necessary for its resolution have been presented, or where necessary for a proper determination of the case," *Heydon v MediaOne of Southeast Mich, Inc*, 275 Mich App 267, 278; 739 NW2d

373 (2007), to do so here would be to disregard the primary principle of our adversarial system by denying each party a full and fair opportunity to be heard. (Citations and quotation marks omitted.) We therefore leave the comprehensive interpretation of MRE 410(4) for an appropriate case that includes briefs, prepared by both parties, addressing the issue.

Returning to the parties' reliance on *Dunn* and the prosecution's argument that defendant had no reasonable expectation to believe that he would be negotiating a plea at the June 8, 2011 meeting, we would note that the version of MRE 410 in effect at the time *Dunn* was decided has no bearing on our Supreme Court's analysis of when MRE 410 applies. Keeping in mind that the amended version of MRE 410 now requires that the statement sought to be excluded have been made in the course of plea negotiations with an attorney for the prosecuting authority, it would stand to reason that the defendant must still have an actual subjective expectation to negotiate a plea at the time of the discussion and that such expectation be reasonable under the totality of the circumstances. See *Dunn*, 446 Mich at 415. Not every requested or held discussion concerning plea negotiations will necessarily result in a plea deal. And simply because a defendant seeks to engage in a plea negotiation does not mean that the person to whom he is speaking (a prosecuting attorney or another person) would or must view any discussion with the defendant as a plea negotiation. There is, therefore, no reason to stray from the guidelines imposed by *Dunn*, despite the amendment of MRE 410. As a result, our analysis establishes no new rule of law, nor does it modify an existing rule of law.

The prosecution claims that the trial court essentially made a finding of fact that defendant's belief that

plea negotiations would take place at the June 8, 2011 meeting was not reasonable. In support of this claim, the prosecution cites the Court's statement that "[t]here was very little discussion about whether a plea agreement was going to be altered and it was pretty apparent that it wasn't." We disagree with the prosecution and conclude that the trial court implicitly found that defendant's expectation was reasonable.

In its closing statement to the trial court, the prosecution clearly cited the two-prong test from *Dunn*, 446 Mich at 415, and argued that defendant's expectation was not reasonable. The trial court heard this argument and nonetheless granted defendant's motion to suppress. Furthermore, the trial court said it did not see a difference between the initiation of the March 15, 2011 meeting and the initiation of the June 8, 2011 meeting. Both were requested by defendant in his attempts to get a better plea agreement. We conclude that this finding was not clearly erroneous. See *Chowdhury*, 285 Mich App at 514. In *Dunn*, 446 Mich at 415-416, our Supreme Court found that the defendant's expectation was reasonable, stating:

> Shortly after his arrest, Dunn initiated communication with the detectives for the express purpose of negotiating a plea bargain with the prosecutor. The detectives encouraged him to talk so they could discuss the possibility of a plea with the prosecutor. With the information supplied by Dunn, the detectives went to the prosecutor and obtained a warrant for the second phone call.

Similarly, defendant initiated the June 8, 2011 meeting by telling his attorney that he thought he should get a better plea deal. In response, Lazzio arranged the meeting with Sergeant Brown. Lazzio did ask Sergeant Brown to tell defendant that the deal was not going to get better. But, importantly, Sergeant Brown did not

simply call defendant and tell him that the plea agreement was not going to improve or that he needed to talk to the prosecuting authority. Instead, Sergeant Brown spoke to the prosecuting authority and, with the prosecution's urging, scheduled another meeting with defendant as requested. The prosecuting authority was involved in the process of scheduling the June 8, 2011 meeting, just as it was with the March 15, 2011 meeting, and directed Sergeant Brown to see what information he could obtain from defendant about the homicide, just as it had with the March 15, 2011 meeting. This was not a situation in which the prosecution took a hands-off approach after the March 15, 2011 meeting was held. Furthermore, all parties were well aware that defendant was specifically requesting the second meeting to see if he could negotiate a better plea agreement. In holding the meeting with the knowledge that defendant requested and would appear at the meeting in an attempt to negotiate a better plea deal, Sergeant Brown, at the prosecution's direction, gave defendant a reasonable belief that plea negotiations would take place at the June 8, 2011 meeting—just as they had when defendant requested the March 15, 2011 meeting for purposes of negotiating a plea agreement.

At the meeting, Sergeant Brown did communicate to defendant that he did not believe the deal would get any better. Sergeant Brown also, however, told defendant that the decision was not his to make, but rather, a decision made by the prosecutor's office. In addition, Sergeant Brown told defendant that he would "give this information to the Prosecutor and they would be very interested in hearing what you just told me." This statement could also serve to bolster defendant's belief that a potentially more promising plea agreement could be forthcoming.

Like the police officers in *Dunn*, 446 Mich at 415-416, Sergeant Brown encouraged defendant to talk by asking him questions about Megan Kreuzer's homicide. In addition, Sergeant Brown implied that defendant could benefit from the additional information he was providing. By saying that the prosecution would be "very interested" in what defendant said, Sergeant Brown indicated that the prosecution might view defendant as a more valuable witness given the additional information, which could result in a better plea deal for him. Furthermore, from defendant's perspective, the June 8, 2011 meeting was very similar to the March 15, 2011 meeting, which led to defendant's initial plea agreement. Both were initiated by defendant. Both were attended by the same individuals—defendant, Lazzio, and Sergeant Brown. During both meetings, Sergeant Brown took notes, which defendant then reviewed and signed. Thus, it was reasonable for defendant to believe that his second meeting with Sergeant Brown would have a similar outcome as the first, and possibly benefit him in terms of a plea deal.

The "totality of the objective circumstances" further support the trial court's finding that defendant's expectation was reasonable. See *Dunn*, 446 Mich at 415. Defendant did not actually enter his plea on the record until June 9, 2011, the day after his June 8, 2011 meeting with Sergeant Brown. Before defendant entered his plea, defense attorney Lazzio told the judge in that case that there were two "tweaks" to the plea agreement. One of the "tweaks" was that defendant would not be charged in the Kreuzer case if he cooperated and testified truthfully and consistently with the statements he made to Sergeant Brown. The prosecutor agreed that was part of the agreement. Thus, Lazzio and the prosecutor made adjustments to the plea agreement even after defendant's June 8,

2011 meeting with Sergeant Brown, and defendant heard that "tweaks" were being made to the agreement such that he could have had a reasonable belief that the plea discussions were still ongoing at that time.

Because we conclude that defendant's June 8, 2011 statement was inadmissible under MRE 410(4), we need not consider whether the statement was also inadmissible because defendant was not advised of his *Miranda*[2] rights.

Affirmed.

CAVANAGH, J., concurred with SERVITTO, P.J.

WILDER, J. (*dissenting*). The prosecution appeals by leave granted[1] the trial court's order granting defendant's motion to suppress. The order suppresses statements made by defendant on March 15, 2011, and June 8, 2011. In its brief on appeal, the prosecution concedes as it did below that defendant's March 15, 2011 statement is inadmissible under MRE 410(4) as a statement made during plea discussions. However, the prosecution continues to assert that defendant's June 8, 2011 statement should not be suppressed under the dictates of MRE 410(4). The prosecution also argues that defendant did not have a right to *Miranda*[2] warnings when he gave his June 8, 2011 statement, and that the statement should also not be suppressed because of a failure to provide *Miranda* warnings. The majority concludes that the trial court properly suppressed defendant's

---

[2] *Miranda v Arizona*, 384 US 436, 444-445; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[1] See *People v Smart*, unpublished order of the Court of Appeals, entered March 27, 2013 (Docket No. 314980).

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

June 8, 2011 statement in conformance with MRE
410(4), and affirms the trial court's order on that basis.[3]
I respectfully dissent.

I

In this case charging defendant with felony murder,
MCL 750.316(1)(b), two counts of armed robbery, MCL
750.529, assault with intent to murder, MCL 750.83,
and possession of a firearm during the commission of a
felony (felony-firearm), MCL 750.227b, defendant seeks
to prevent the use as evidence against him of state-
ments he made in an effort to obtain a plea agreement
in a separate, unrelated case in which he was charged
with carjacking, MCL 750.529a, armed robbery, MCL
750.529, felony-firearm, MCL 750.227b, and conspiracy
to commit armed robbery, MCL 750.157a. Defendant
successfully obtained an order suppressing his state-
ments following an evidentiary hearing conducted by
the trial court on April 11, 2012, and April 12, 2012. The
evidence adduced at the hearing established the follow-
ing.

On June 10, 2010, defendant was arrested in connec-
tion with a carjacking case and taken into custody. At
the beginning of 2011, defendant informed his attorney
that he was interested in providing information he
knew about a homicide to the prosecution in exchange
for a plea deal in his carjacking case. As a result of
defendant's instructions, defendant's attorney con-
tacted Richmond Riggs, the managing assistant pros-
ecuting attorney in the Genesee County Prosecutor's
Office. Defense counsel told Riggs that her client had
witnessed a homicide and was interested in a plea deal

---

[3] The majority found it unnecessary to address defendant's claim that
his *Miranda* rights were violated in light of its conclusion that the
statements were properly suppressed under MRE 410(4).

in his carjacking case in exchange for giving the prosecutor the information he had about the homicide. Because defense counsel was concerned that defendant could be subject to additional criminal charges because he was purportedly dealing drugs when he witnessed the homicide, defense counsel sought assurances from Riggs that anything defendant said in the interview would not be used against him. Riggs agreed to this condition because he had no indication based on what defense counsel had told him that defendant was in any way involved in the homicide. However, Riggs testified that, pursuant to office policy, in advance of his statements, no blanket promise was made to defendant that he would not be charged with the homicide if it were later determined defendant was involved in some way.

Riggs contacted Sergeant Mitch Brown, the officer in charge of the May 31, 2010 homicide of Megan Kreuzer. After some conversations between defense counsel, Riggs, and Brown, it was confirmed that defendant was claiming to have witnessed Kreuzer's homicide. After verifying that defendant still wanted to talk, defense counsel contacted Riggs again and reconfirmed that anything defendant said in the interview would not be used against him. Riggs then instructed Brown to meet with defendant to see what he knew about the Kreuzer homicide and to get a statement if possible.

Brown first met with defendant and defense counsel on March 15, 2011. At this meeting, Brown did not advise defendant of his *Miranda* rights, but subsequently explained that he had told defendant that he was not a suspect in the homicide case and was not in custody for that offense because defense counsel had told Brown that defendant was just an eyewitness. Defendant gave his initial statement to Brown, and Brown told defendant that, in his view, defendant's

story did not make sense. To defense counsel's surprise, defendant then implicated himself in the murder by admitting that he had supplied the weapon used in the murder. Brown then told defendant that he could be charged with the homicide if he was involved, and that this charging decision was up to the prosecutor, and chastised him for not being honest with his attorney. Defendant admitted that he had not been completely truthful with defense counsel before the interview. Brown left the interrogation room so that defendant and defense counsel could talk privately. After speaking with defendant, defense counsel spoke privately with Brown, who informed defense counsel that one of the murder suspects, Jamario Mays, wanted to cooperate with police and provide information about the homicide. Brown speculated that defendant's statement might not be of much use to the prosecution if Mays was cooperative.

Brown and defense counsel returned to the interrogation room to continue the interview, and defense counsel indicated the interview should stop if defendant were to further implicate himself. Defendant then told Brown that he had received a phone call from Mays and Anthony Michael, who were looking for a gun. Defendant said he had told them he had a handgun and an AK-47 assault rifle, and that they had decided to buy the AK-47 from defendant. They made plans for defendant to bring the weapon over to Mays's house, and Mays, Michael, and Mays's sister were at the house when defendant arrived. Both Mays and Michael handled the rifle.

Defendant told Brown that after the sale, he left to go to a house on Dartmouth Street. At some point, he received a phone call from someone who wanted to buy crack cocaine, so he walked to a party store nearby to

sell the crack. Before he left or while he was walking, defendant received a call from Mays. They agreed that in exchange for the AK-47, Mays would give defendant a quarter pound of marijuana that defendant would sell for $400, of which he would keep $350 and give Mays $50. Defendant continued walking to sell the crack and ran into Mays and Michael, who told defendant that they were going to rob someone. Mays showed defendant a sawed-off shotgun in his shirt sleeve but said it was not loaded. Defendant asked why they needed a weapon from him if they already had a weapon, and then observed a car pull up and Mays walk up to the passenger side. Michael approached the driver's side. Someone said "give it up," and Michael pointed the AK-47 at the car's occupants. Then defendant heard pops and saw that shots were fired. The car sped away. Michael tried to give him the AK-47 back, but because defendant had seen a state police vehicle in the area, he refused to take it.

Consistently with his usual practice during an interview, Brown took notes on preliminary information about defendant's education and health status—to be certain defendant was sufficiently coherent to participate in the interview—and he took extensive notes about his conversation with defendant. Defendant reviewed the notes, made corrections to them, and signed them. Brown then faxed his notes to Riggs, who instructed Brown to speak with Mays to see if the stories were consistent. Brown testified that he was aware plea discussions were occurring at the time, but he never sat down with defense counsel and Riggs when they were discussing a plea agreement.

After his March 15, 2011 interview with Brown, defendant was offered a plea agreement in the carjacking case. Defendant agreed to plead guilty to unarmed

robbery and felony-firearm in exchange for the prosecution's agreement to drop all other charges. As part of the plea agreement, defendant also agreed to testify truthfully and consistently with the statement he made to Brown regarding the Kreuzer homicide. On May 12, 2011, the prosecution signed a written plea agreement conforming to the terms agreed to by defendant. Defendant and defense counsel signed it on May 23, 2011.[4]

After the plea agreement was signed but before defendant appeared in court to formally plead guilty and place the agreement on the record, at defendant's request, defense counsel contacted Brown directly for a second meeting with defendant. Defense counsel testified that defendant had become concerned about the two years he would have to serve on the felony-firearm count he had agreed to plead guilty to, and that he had expressed doubt about whether she had actually negotiated with the prosecution to get the best deal available. Both Brown and defense counsel understood from the prosecutor's office that the plea agreement would not be changed. Defense counsel told Brown that defendant thought he should have a better deal and she urged Brown to tell defendant that his plea deal was not going to get better. The prosecutor's office agreed that, as defense counsel had requested, Brown should meet with defendant. The prosecutor's office viewed the meeting only as an opportunity to get more information on the homicide, if possible. Brown met with defendant on June 8, 2011, and once again he did not advise defendant of his *Miranda* rights. As requested by defense counsel and consistently with his own understanding, Brown told defendant that, based on what he understood from the prosecutor's office, he did not think the plea deal was going to get better. Brown also told

---

[4] The written plea agreement was not included in the record on appeal.

defendant that the prosecutor's office, and not Brown, would decide what plea deals to offer, so defendant could "take it or leave it."

According to Brown, he and defendant then began talking about the night Kreuzer was killed, and defendant told him that he had not been totally honest about what had happened that night. Defendant then gave another statement in which he admitted that when he brought the gun over to Mays's home, Mays and Michael were talking about committing a robbery, so he knew that was their plan. Defendant did not go to the house on Dartmouth. He stayed at Mays's house and walked with Mays and Michael down the street to the meeting with Kreuzer. Defendant went because he did not think they would go through with the robbery and he wanted to see if they actually would. Brown asked defendant if he told Mays and Michael that he was going to take back the gun when he found out that they planned to commit a robbery. Defendant said he did not. Brown had defendant read over his notes and defendant signed them. These notes were not as extensive and did not include his usual information concerning defendant's ability to comprehend, because he had not anticipated conducting an interview when he went to meet with defendant. Brown reiterated to defendant that he had no discretion concerning plea negotiations, and that he would give this new information to the prosecutor.

Brown testified that he had interviewed Mays and Michael before his second meeting with defendant. From his interview with Mays, Brown knew before meeting with defendant that when Mays and Michael left Mays's house to go meet with Kreuzer and commit the robbery, defendant left Mays's house with them. The trial court asked Brown:

*The Court*: That didn't make [defendant] a suspect in your eyes?

[*Brown*]: Well, I gave the information to the Prosecutor's Office. And, like I said, I thought he could be charged in the crime. But we -- but he wasn't -- but he wasn't charged and he wasn't the person that pulled the trigger. The information we had was that it was Anthony Michael, and that was what he had indicated that he was willing to testify on.

\*  \*  \*

*The Court*: From Day One that you met with him until the end, he wanted a better plea deal?

[*Brown*]: That's correct.

*The Court*: And even when he was on the stand and refused to testify because he didn't get a good plea deal?

[*Brown*]: According to him. That's correct.

Defendant testified that Brown had told him he would not be charged in connection with the homicide because they wanted the guy who did it, not him. Defendant was not sure if Brown said that during the first or second interview. Defendant thought that the only way he would be charged was if he lied or changed his story on the witness stand.

On June 9, 2011, defendant pleaded guilty to unarmed robbery and felony-firearm in the carjacking case. While the plea was given in general accord with the written plea agreement, in which all other charges were to be dismissed, defense counsel and the prosecutor also agreed on the record that defendant would not be charged in the Kreuzer homicide if he continued to cooperate and testified truthfully and consistently with the statements he had already made. Although nothing in the plea agreement expressly stated that defendant would not be charged with murder, the prosecutor and

defense counsel confirmed their understanding that this provision was one of the agreed-upon outcomes of the plea negotiations. In addition, because there was no sentence agreement contained in the plea agreement, the trial court also informed defendant when accepting his plea that the sentence imposed would be determined at the discretion of the court.

On June 30, 2011, despite being warned that he could be charged with homicide if he failed to comply with the plea agreement he had signed on May 23, 2011, defendant refused to testify against Michael during Michael's preliminary examination.

II

I believe there are two issues presented on appeal as it concerns the trial court's order suppressing defendant's June 8, 2011 statement: (1) whether the June 8, 2011 statement may be suppressed under MRE 410(4), and (2) whether defendant was entitled to *Miranda* warnings.

A

"This Court reviews de novo the trial court's ultimate ruling on the defendant's motion to suppress." *People v Brown*, 279 Mich App 116, 127; 755 NW2d 664 (2008). If this Court's "inquiry requires interpretation of the Michigan Rules of Evidence, an issue of law is presented, which this Court reviews de novo." *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007). The trial court's findings of fact at a suppression hearing are reviewed for clear error, *People v Chowdhury*, 285 Mich App 509, 514; 775 NW2d 845 (2009), and will only be disturbed if this Court is left with "a definite and firm conviction that a mistake was made." *Brown*, 279 Mich App at 127. But the

application of those facts to the relevant law is reviewed de novo. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013); *Cain v Dep't of Corrections*, 451 Mich 470, 503 n 38; 548 NW2d 210 (1996).

In construing the rules of evidence, this Court applies "the legal principles that govern the construction and application of statutes. When the language of an evidentiary rule is unambiguous, we apply the plain meaning of the text without further judicial construction or interpretation." *Craig v Oakwood Hosp*, 471 Mich 67, 78; 684 NW2d 296 (2004) (citations and quotation marks omitted).

B

Rule 410 of the Michigan Rules of Evidence provides:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> &ast; &ast; &ast;
>
> (4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

In light of the facts developed in the suppression hearing, I would conclude that the June 8, 2011 statement did not occur in the course of plea negotiations with an attorney for the prosecuting authority.

1

In *People v Hannold*, 217 Mich App 382, 391; 551 NW2d 710 (1996), this Court held that when the facts establish that "no prosecuting attorney was present at

the time defendant made his incriminating statements to the police," MRE 410(4) as amended "is simply inapplicable."[5] The undisputed record in this case establishes that defendant made his statements only in the presence of his defense attorney and Sergeant Brown. Thus, were we to do nothing more than apply the binding holding in *Hannold* to the facts of this case without further analysis, at a minimum, we would be compelled to conclude that the trial court erred by suppressing defendant's statement under MRE 410 because no prosecuting attorney was present at the time of the statement.

2

However, as is highlighted by the prosecution's concession that defendant's March 15, 2011 statement is properly suppressed, *Hannold* as written is not easily applied to the facts of this case. In my view, *Hannold* errs by stating as a blanket rule of law that the physical presence of a prosecuting attorney is required in order for MRE 410(4) to be applicable.

a

The plain language of MRE 410(4), "[a]ny statement made in the course of plea discussions with an attorney for the prosecuting authority," is unambiguous. See *Craig*, 471 Mich at 78 (stating that when the language of an evidentiary rule is unambiguous courts must apply the plain meaning without further construction

---

[5] *Hannold*'s conclusion is consistent with our Supreme Court's holding in *People v Williams*, 475 Mich 245, 255-256; 716 NW2d 208 (2006), that "[a]lthough investigating police officers may and do cooperate with the prosecutor, they are not part of the prosecutor's office." Nor are they agents of the prosecutor such that knowledge by the police should be imputed to the prosecutor. *Id.* at 256.

or interpretation). The phrase "in the course of" means "in the process of, during the progress of." I *Oxford English Dictionary* (compact ed., 1971), p 1088. Given this unambiguous meaning, the phrase "in the course of" does *not* and cannot also solely mean "in the presence of." Therefore, under the plain language of the rule, only a statement made by a defendant in the progress or process of plea discussions with an attorney for the prosecuting authority would be excluded from admission into evidence. The fact that an attorney for the prosecuting authority is not present when the statement is made is not dispositive as to the question whether MRE 410(4) is applicable.

In my judgment, defendant's March 15, 2011 statement was made in the progress or process of plea discussions with an attorney for the prosecuting authority as conceded by the prosecution, and as argued by the prosecution, defendant's June 8, 2011 statement was not. Before defendant's March 15, 2011 statement, defense counsel and Riggs had extensive discussions about the conditions under which defendant would give his statement; defense counsel expressly sought from the prosecutor a reduction in charges in the carjacking case, and an agreement that defendant's statements to Brown about the homicide would not be used against him. Before defendant's June 8, 2011 statement, defense counsel's negotiations with Riggs resulted in a signed a plea agreement in the carjacking case. The signing of the plea agreement by defendant and the prosecutor necessarily evidences that plea negotiations in the carjacking case were completed. See *Meece v Commonwealth*, 348 SW3d 627, 650 (Ky, 2011) (stating that plea negotiations ended after the defendant signed the agreement and before he made any statement, so the statement was not made in the course of plea discussions).

Significantly, however, when defendant wished to seek a "better deal" than the one he had already agreed to, defense counsel did *not* call Riggs in an effort to reopen negotiations in the carjacking case. Rather, to initiate the opportunity to make a second statement, defense counsel instead called Brown, who had never been a party to the plea negotiations. The record shows that the prosecution, defense counsel, and Brown all understood that the prosecution had no intention to revise its written agreement with defendant. After being informed by Brown of defense counsel's request for Brown to meet again with defendant, Riggs agreed that Brown should talk to defendant a second time solely to obtain additional information about the Kreuzer homicide.[6] Neither Riggs nor defense counsel engaged in any discussions to the contrary, and the fact that the plea deal would not get any better was made clear to defendant by Brown at the outset of the second interview—before defendant made any statements. Thus, the uncontradicted evidence is that defendant's June 8, 2011 statement did not occur while in the progress or process of plea negotiations with the prosecuting authority.[7]

---

[6] I disagree with the majority's conclusion that the fact that Brown told defendant that the prosecution would be "very interested" in the content of the second interview indicates that plea discussions were in progress at that time. While Riggs agreed that Brown should attempt to obtain additional information about the Kreuzer homicide from defendant, no promises were made by Riggs or Brown to defendant for that information and defendant did not provide it conditionally.

[7] The June 9, 2011 "tweaks" referred to by the majority do not indicate that plea discussions were still in progress on June 8, 2011. Although defense counsel and the trial court used the word "tweaks" when referring to the promise that defendant would not be charged in the Kreuzer homicide and the fact that the sentence would be chosen by the trial court, not the prosecutor, the plea agreement did not change. As the record demonstrated, that defendant would not be charged in the Kreuzer homicide because of his cooperation was understood by counsel

In this regard, the facts of this case are similar to the facts in *Hutto v Ross*, 429 US 28, 28-30; 97 S Ct 202; 50 L Ed 2d 194 (1976). In that case, the defendant entered into a plea agreement with the prosecuting attorney by which the defendant would plead guilty to the charge of embezzlement in exchange for the prosecutor's recommendation that the defendant be given a 15-year sentence, with 10 years of the sentence to be suspended. Subsequently, the prosecutor asked the defendant to make a statement concerning the crime. Although defense counsel advised the defendant against making the statement, on the basis that the already negotiated plea agreement was enforceable regardless of the defendant's willingness to make the statement being requested, the defendant accommodated the prosecutor and made a statement confessing to the embezzlement. The defendant later decided to withdraw the plea, hired new counsel, and proceeded to trial. The prosecutor sought admission of the defendant's statement at trial, and following an evidentiary hearing outside of the presence of the jury, the trial court allowed admission of the statement. The defendant was convicted and sentenced to 21 years' imprisonment. On appeal, the United States Supreme Court held that because the defendant's statement was not made during the plea negotiation process, was not the result of an express or implied promise involving the plea or any coercion on the part of the prosecution, and was not involuntary, the statement was properly admitted at trial.

For these reasons, MRE 410(4) does not bar admission of defendant's June 8, 2011 statement to Brown.

---

to be a part of the plea agreement, even though this understanding was not memorialized in writing. Similarly, that the trial court would impose a sentence of its choice, "not the Prosecutor's choice," did not constitute a change in the agreement. The plea agreement never contained a sentencing provision.

b

Because the plain language of MRE 410(4) as amended is unambiguous and easily applied to the facts of a case in an objective fashion, I further contend that the majority errs, as did *Hannold*, as a matter of law in applying the two-tiered, "reasonable expectations" analysis enunciated in *People v Dunn*, 446 Mich 409, 415-416; 521 NW2d 255 (1994), to determine whether defendant's statements were properly suppressed.

The defendant in *Dunn* made his statements to the police before the substantial 1991 amendment of MRE 410. At that time, the rule provided:

> Inadmissibility of Pleas, Offers of Pleas, and Related Statements.
>
> Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement. [*Dunn*, 446 Mich at 414 n 14, citing MRE 410, as adopted March 1, 1978.]

The reasonable expectations standard—whether a defendant had a "subjective expectation to negotiate a plea at the time of the discussion," and whether that expectation was reasonable given the totality of the objective circumstances—was not derived from the plain language of the earlier version of MRE 410. Rather, *Dunn* incorporated the two-tiered analysis construing the similar but not identical FRE 410, which

was adopted by the Fifth Circuit Court of Appeals in
*United States v Robertson*, 582 F2d 1356, 1366 (CA 5,
1978). In contract law, our Supreme Court has rejected
an interpretive approach in which "judges divine the
parties' reasonable expectations" rather than interpret
the plain language of the parties' agreement. *Wilkie v
Auto-Owners Ins Co*, 469 Mich 41, 51-52; 664 NW2d 776
(2003). Similarly here, I would conclude that the plain
language of MRE 410(4), and not defendant's expecta-
tions, should govern the outcome in this case. See
*Menard Inc v Dep't of Treasury*, 302 Mich App 467, 479;
838 NW2d 736, 745 (2013). Because the prosecuting
authority had concluded its negotiations with defen-
dant with the signing of a plea agreement, defendant's
June 8, 2011 statement to Brown should not be con-
strued as having occurred "in the course of plea discus-
sions with an attorney for the prosecuting authority,"
regardless of what defendant claims his expectations
were.

C

In its opinion, the majority states that it declines to
consider whether and how the amendment of MRE 410
applies to the facts in this case, giving four reasons for that
decision: (1) the prosecution's argument—that MRE 410
does not apply in this case because, there being no
prosecuting attorney present during the June 8 state-
ment, defendant could not have had a reasonable expec-
tation that this meeting would result in further plea
negotiations—is abandoned for the reason that the pros-
ecution's briefing on this question was inadequate in that
it failed to elaborate on the claim or cite the prior
language of MRE 410; (2) because the prosecution
inadequately briefed the issue, the majority will not
address whether or not there was an attorney for the

prosecuting authority present during the June 8, 2011
meeting; (3) the prosecution has foreclosed review of the
issue because, given its admission that the March 15, 2011
statement was given in the course of plea discussions with
the prosecuting authority even though no prosecutor was
present when defendant made the actual statement, it has
conceded that for purposes of MRE 410, a prosecuting
attorney need not be physically present to hear the state-
ments made; and (4) the precise meaning and application
of the phrase "with an attorney for the prosecuting
authority" cannot be decided without proper briefing by
the parties.[8]

I respectfully disagree with the majority's view that
this issue should not be specifically addressed by this
Court. When a controlling legal issue is squarely before
the Court, "the parties' failure or refusal to offer correct
solutions to the issue" places no limits on the "Court's
ability to probe for and provide the correct solution."
*Mack v Detroit*, 467 Mich 186, 206-207; 649 NW2d 47
(2002). Rather, addressing a controlling legal issue
despite the failure of the parties to properly frame it is
a well-understood judicial principle. *Id.* at 207. It is
beyond dispute that when this Court's "inquiry re-
quires interpretation of the Michigan Rules of Evi-
dence, an issue of law is presented, which this Court
reviews de novo." *Dobek*, 274 Mich App at 93. See also
*Cain*, 451 Mich at 503 n 38. Whether the trial court
correctly suppressed defendant's June 8, 2011 state-
ment to Brown cannot be properly decided without
interpreting MRE 410(4). Thus, this Court's duty is to

---

[8] Despite its stated reticence to interpret MRE 410(4), the majority,
nevertheless, goes on to conclude that "it would stand to reason that" the
two-tiered, reasonable expectations analysis articulated in *Dunn* neces-
sarily continues to apply under the amended, current version of MRE
410(4).

construe MRE 410(4) and apply it to the facts presented, regardless of the quality of the briefing and argument by the parties.

Moreover, although this Court does not generally address issues not raised by the parties on appeal, *Clohset v No Name Corp (On Remand)*, 302 Mich App 550, 560; 840 NW2d 375 (2013), citing *Mayberry v Gen Orthopedics, PC*, 474 Mich 1, 4 n 3; 704 NW2d 69 (2005), this Court may properly review "an unpreserved question of law where the facts necessary for its resolution have been presented," *People v Houston*, 237 Mich App 707, 712; 604 NW2d 706 (1999). In this case, the record is clear that plea discussions with an attorney for the prosecuting authority were completed, as signified by the plea agreement signed by the prosecutor on May 12, 2011, and signed by defendant and defense counsel on May 23, 2011, well before defendant's June 8, 2011 interview with Brown. Whether defendant could reinitiate plea discussions with the prosecuting authority solely by communicating with Brown and not engaging in additional discussions with Riggs, and whether under these facts defendant's June 8, 2011 statement to Brown is admissible present questions of law that can and should be answered by analyzing the plain language of MRE 410(4) and applying it to the facts of this case.

D

In summary, because (1) the plea agreement between defendant and the prosecution was completed before the June 8, 2011 interview with Brown, (2) defense counsel made no effort to reengage the prosecution in additional discussions concerning defendant's plea agreement, (3) the evidence is clear that the prosecution agreed that Brown should conduct a second inter-

view with defendant only to see what additional information defendant would reveal about the homicide, and (4) defense counsel and Brown clearly conveyed to defendant that the prosecution would not offer any better plea deal in the carjacking case before he made his second statement, I would find on review de novo that the trial court erred when it found defendant's June 8, 2011 statement occurred "in the course of plea discussions with an attorney for the prosecuting authority," under MRE 410(4). See *Cain*, 451 Mich at 503 n 38.

III

The prosecution also contends that defendant had no right to *Miranda* warnings on June 8, 2011, so the statement should not be suppressed on the basis that he did not receive them. I agree.

A

Whether defendant was subjected to custodial interrogation, and thus entitled to *Miranda* warnings, is a mixed question of law and fact; this Court reviews the trial court's findings of fact for clear error but reviews questions of law de novo. *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001). A trial court's factual findings will only be disturbed if this Court is left with "a definite and firm conviction that a mistake was made." *Brown*, 279 Mich App at 127.

B

The Fifth Amendment's privilege against self-incrimination requires that a suspect be informed of certain rights before he or she is subject to a custodial interrogation. *Miranda*, 384 US at 444-445; *People v*

*Vaughn*, 291 Mich App 183, 188-189; 804 NW2d 764 (2010); see also US Const, Am V. These *Miranda* warnings include

> the right to remain silent, that anything he [the defendant] says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. [*Miranda*, 384 US at 479.]

The general test for determining if an individual is in custody is whether "in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v Fields*, 565 US ___, ___; 132 S Ct 1181, 1189; 182 L Ed 2d 17, 27 (2012) (citations and quotation marks omitted; alteration in original). However, an individual's imprisonment, by itself, is not enough to create a custodial environment. *Id.* at ___; 132 S Ct at 1190; 182 L Ed 2d at 28-29. When an individual is already in custody, he or she is not "yanked from familiar surroundings in the outside world and subjected to interrogation in a police station," which may make an individual feel coerced into answering questions. *Id.* at ___; 132 S Ct at 1190-1191; 182 L Ed 2d at 29. In addition, unlike an individual who is not in custody, a prisoner knows that he or she will remain confined after the questioning; the prisoner's cooperation in answering questions will not earn him or her a prompt release. *Id.* at ___; 132 S Ct at 1191; 182 L Ed 2d at 29. Finally, a prisoner who has been convicted and sentenced likely knows that the questioning officers do not have the authority to reduce his sentence. *Id.* at ___; 132 S Ct at 1191; 182 L Ed 2d at 29.

To determine whether a prisoner is in custody, a court should consider "the language that is used in summoning the prisoner to the interview and the

manner in which the interrogation is conducted." *Id.* at
___; 132 S Ct at 1192; 182 L Ed 2d at 30-31. In *Howes*,
565 US at ___; 132 S Ct at 1192-1194; 182 L Ed 2d at
31-32, the Supreme Court found that the prisoner was
not in custody for purposes of *Miranda*, especially given
that he was told he was free to end the questioning and
return to his cell at any time.

In this case, defendant was not in custody for purposes
of *Miranda* when he made the statement on June 8, 2011.
Although defendant was in custody on the carjacking case
on June 8, 2011, he initiated the second interview con-
cerning Kreuzer's homicide through his attorney in an
attempt to obtain a better plea deal, and was not sum-
moned by Brown or the prosecutor. In addition, before
defendant made any statements he was informed by
Brown that a better plea agreement was not available,
that he (Brown) had no authority to negotiate a new
agreement, and that the terms of any agreement were
within the discretion of the prosecution. Furthermore,
defendant's attorney was present throughout the entire
meeting.

IV

For all the foregoing reasons, I would reverse.